**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **ALLIED WORLD INSURANCE COMPANY, ALLIED WORLD SPECIALTY INSURANCE COMPANY, ALLIED WORLD NATIONAL ASSURANCE COMPANY, and UNITED STATES FIRE INSURANCE COMPANY,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**JAMES KEATING and AMERICAN CONSTRUCTION & INDUSTRIAL, LLC,**<br><br>**Defendants.** | **CIVIL ACTION NO. 3:21-cv-00058-VLB**<br><br>**April 1, 2022** |

**PLAINTIFFS' LOCAL RULE 56(a)1 RULE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**Pursuant to the Rule 56(a)1 of the Local Rules of this Court, Plaintiffs Allied World Insurance Company ("AW Insurance"), Allied World Specialty Insurance Company ("AW Specialty"), Allied World National Assurance Company ("AW National"), and United States Fire Insurance Company ("USFIC") (collectively, "Allied World") submit the following Statement of Undisputed Material Facts in support of their Motion for Summary Judgment against Defendants James Keating and American Construction & Industrial, LLC ("American Construction") in the above-captioned action.**

## A. Background

**1. Defendants invoked their Fifth Amendment right against self-incrimination in response to every substantive allegation and question during**

**discovery—including in Defendants' Answer and in their depositions. Declaration of Kelly Doherty-Schaffner, dated March 29, 2022 ("Decl.") ¶ 3, Exs. 1-3.[1]**

**2. Plaintiff Allied World is a global provider of insurance and reinsurance solutions. Decl. ¶ 4; Ex. 1 ¶ 11. In February 2014, Allied World hired Keating to handle its surety bond claims. Decl. ¶ 5; Exs. 1-2 ¶¶ 14-15; Ex. 3 at 7:23-8:5, 9:20-25. At the time, Keating was (and remains) a licensed attorney in Pennsylvania. Exs. 1-2 ¶ 6; Ex. 3 at 6:20-7:3. Keating held the title of Assistant Vice President, Surety Claims while he was employed by Allied World. Decl. ¶ 5; Ex. 3 at 8:16-25.**

**3. As an attorney and an officer of the company, Keating was a fiduciary of Allied World. Exs. 1-2 ¶ 45; Ex. 3 at 10:8-11:10. As a claims handler, Keating had the authority to retain attorneys to consult on claims and represent Allied World in litigation. Decl. ¶¶ 6, 26; Ex. 3 at 10:2-7. Keating also had the power to authorize payments issued by Allied World to the attorneys and vendors he retained in connection with the claims he handled. Decl. ¶ 6; Ex. 3 at 10:8-13.**

**4. In or around July 2019, Allied World exited the surety bond business and transferred its existing portfolio of surety bonds business to its affiliate Crum & Forster. Decl. ¶ 7. At approximately the same time, Keating was transferred from AW National to Crum & Forster's insurance subsidiary USFIC, where he continued to handle claims on the run off of surety bonds issued by AW Insurance and AW Specialty. *Id.*; Exs. 1-2 ¶ 15; Ex. 3 at 9:2-10.**

**[1] Exhibits cited herein as "Ex. __" refer and correspond to the numbered exhibits attached to Ms. Doherty-Schaffner's Declaration.**

**5. At all times relevant, Allied World's operations team in Farmington, Connecticut was responsible for establishing surety claims files and reviewing requests for payments by surety claims handlers. *See* Decl. ¶ 27; Exs. 1-2 ¶¶ 16.**

**6. Keating does not contest that he owed fiduciary duties to Allied World as an officer of the company and as an attorney. Exs. 1-2 ¶ 45; Ex. 3 at 10:8-11:10. In addition, when he began working at Allied World, Keating received the company's employment manual and the company's Code of Business Conduct and Ethics—which he also received from USFIC when his employment was transferred there. Decl. ¶ 8; Exs 1-2 ¶ 18; Ex. 3 at 11:11-15, 12:4-14, 13:17-21:25; Exs. 4-5.**

**7. As recently as December 17, 2020, Keating certified that: he was "in compliance with the requirements of the Code"; he "d[id] not have any interest, affiliation or activity of any sort which would be a conflict of interest … under the Code"; he was "not an officer or director of any company … except as previously disclosed to and/or approved by the Board of Directors, Chairman or Secretary, as required by the provisions of the Code"; and he would "promptly disclose any facts which may appear to present a possible conflict of interest under the Code." Decl. ¶ 9; Exs. 1-2 ¶ 19; Ex. 3 at 15:23-22:15; Ex. 5 at 6-8.**

**8. Allied World's and USFIC's Code of Business Conduct and Ethics provide, among other things, that:**

**a. "Employees owe a duty to the Company to advance its legitimate interests when the opportunity arises. It is improper for officers, directors and employees: … to use information received performing services for the Company for personal gain, or to otherwise compete**

**in any way with the Company in its legitimate interests." Ex. 4 at 12; *see also* Ex. 5 at 1.**

b. **"Employees must not knowingly permit themselves to be placed in a position where their interests could become adverse to the Company's interests, including situations where the employee could be deemed to be competing with the Company." Ex. 4 at 10; *see also* Ex. 5 at 1-2.**

c. **"Transactions involving the Company and … an entity in which an employee has a material interest must be brought to the attention of the employee's supervisor to determine if the transaction poses a perceived, potential or actual conflict of interest."** ***Id.***

d. **"Employees must obtain written approval from their supervisor before accepting outside employment or serving as a director, trustee, officer, owner, partner or consultant of a for-profit organization, regardless of whether compensation in any form is received." Ex. 4 at 19; *see also* Ex. 5 at 1, 6-7.**

e. **"Every director, officer and other employee of the Company should avoid any situation where the personal interest of such director, officer or employee conflicts, or may appear or be likely to conflict, with any interest of the Company." Ex. 5 at 1.**

f. **"[N]o such officer, director, or employee shall either take for him or herself, any opportunity discovered through his or her employment or**

**affiliation with the Company, or use corporate property, information, or position for his or her personal gain."** ***Id.***

**g. "No director, officer or other employee shall participate on behalf of the Company in any negotiations or dealings of any sort with any non-affiliated person, firm, corporation, or entity, in which he or she has, either directly or indirectly, an interest …."** ***Id.***

**9. Keating formed a company called SR5, LLC (dba Surety Risk Solutions) in November 2013. Decl. ¶ 10; Ex. 3 at 22:11-18; Ex. 6 at SR5000018-19. SR5's publicly available Certificate of Organization lists Keating as the company's organizer, and lists Keating's home address in Paoli, Pennsylvania as the company's registered office. Decl. ¶ 10; Ex. 6 at SR5000018-19. SR5 has never had an LLC agreement, never had had any legitimate employees; and never observed any corporate formalities as a legitimate company normally would observe. Ex. 3 at 22:23-23:8.**

**10. On April 1, 2014 (two months after he began working at Allied World) Keating opened a bank account for SR5 (dba Surety Risk Solutions) at a TD Bank branch in Pennsylvania. Decl. ¶ 10; Ex. 7;** ***see also*** **Ex. 3 at 57:20-23. Keating submitted a formal resolution to open the account, which he signed as SR5's "Owner." Ex. 6 at SR5000016.**

**11. Allied World's company policies and Keating's fiduciary duties to his employers required him to disclose to the existence of his and SR5's ownership interest in that company to Allied World. Ex. 4 at 10, 19; Ex. 5 at 1-2. He never did. Decl. ¶ 11; Ex. 3 at 23:9-13. Keating received at least $1,010,916.83 in compensation**

**from Allied over the course of his employment (Decl. ¶ 12; Ex. 11), all while knowing that he was in breach of the fiduciary duties he owed to Allied World from the first day of his employment until the day he was fired. Ex. 3 at 60:3-15.**

**B. <u>Keating's Undisclosed Work For A Competitor</u>**

**12. In January 2014, Keating (through SR5) began working as a third-party administrator of surety bond claims issued by Nationwide Mutual Insurance Company, an Allied World competitor, and several of its subsidiaries—including Harleysville Mutual Insurance Company and Harleysville affiliates (collectively, "Nationwide"). Decl. ¶ 13; Ex. 3 at 24:7-29:18; Ex. 6 at SR500035-36.**

**13. Over the next five years, Nationwide paid Keating at least $285,387.67 through SR5 for his continued work. Decl. ¶ 14; Ex. 3 at 27:21-25. Keating never disclosed this arrangement to Allied World. Decl. ¶ 14; Ex. 3 at 26:17-27:20, 60:16-24.**

**C. <u>Keating's Undisclosed Kickback Scheme</u>**

**14. In January 2015, Keating retained his friend and former law school classmate ("Attorney 1") and his firm to represent Allied World in several surety and performance bond claims matters. Decl. ¶ 15; Ex. 3 at 30:20-31:4.**

**15. Keating does not contest that agreed to retain Attorney 1 on behalf of Allied World as part of a *quid pro quo* relationship in which Attorney 1 would pay Keating kickbacks of approximately 10 percent of the fees Allied World paid Attorney 1 and his firm, and Keating effectively admitted that he approved invoices from Attorney 1's firm for payment knowing that he would receive approximately 10 percent of those fees as kickback payments. Decl. ¶¶ 16-18; Ex. 3 at 31:5-18.**

**16. Attorney 1 made the first kickback payment to Keating on May 17, 2015, when Attorney 1 wrote a check from his firm account for $745.50 to SR5, purportedly for "consulting re Progressive." Decl. ¶ 18, Ex. 8 at TD0002334.**

**17. For more than five years, Keating continued to receive payments from Attorney 1 and his firm (through SR5), totaling at least $331,086.02. Decl. ¶ 18 (citing Exs. 8-9); Ex. 3 at 32:24-33:5. In exchange, Keating continued to secure work for them representing Allied World. Ex. 3 at 31:5-18. As a result, Allied World paid at least $3,467,103.63 to Attorney 1 and is firm between February 2015 and May 2021. Decl. ¶ 17; Ex. 12. Neither Keating nor Attorney 1 ever disclosed this clear conflict of interest to Allied World. Decl. ¶ 18; Ex. 3 at 32:7-9, 34:22-35:2.**

**18. Keating also reversed at least $98,762.00 in reductions on Attorney 1's invoices imposed by Allied World auditors in Allied World's billing system—without informing anyone at Allied World—resulting in Attorney 1 receiving those additional funds at Allied World's expense. Ex. 3 at 32:3-14. From these reductions, Keating received approximately 10 percent in the form of kickback payments. *Id.* at 31:19-32:20.**

**D. <u>The Asset Search Firm 1 Scheme</u>**

**19. Because surety claims often involve efforts to hunt down assets of principals and other relevant parties, and perfecting security interests on them, Keating was authorized to hire companies on behalf of Allied World to perform asset searches for claims he handled. Decl. ¶ 19.**

**20. Beginning in November 2016, Keating and Attorney 1 formed a new company as a joint venture ("Asset Search Firm 1")—purportedly to provide asset search and UCC filing reports for Allied World. Decl. ¶¶ 19-24; Ex. 3 at 35:9-19.**

**21. On November 21, 2016, Keating sent an email from his Allied World email account to info@[AssetSearchFirm1].com to request pricing information for asset searches and UCC filings. Decl. ¶ 20. Attorney 1 responded to Keating's inquiry later that day using an [AssetSearchFirm1].com email address. *Id.* Attorney 1 quoted Asset Search Firm 1's fees as $450 for personal asset searches and $1,000 for corporate asset searches. *Id.* ¶ 21. The asset search firm Allied World employed charged $250 for asset searches of an individual, and $300 for a business entity. *Id.***

**22. Shortly thereafter, Keating began retaining Asset Search Firm 1 to perform asset searches for Allied World. *Id.* ¶ 22; Ex. 3 at 36:24-37:4, 37:22-38:6. Keating would use Asset Search Firm 1 on over 100 occasions over the next four years to perform asset searches and UCC filings for Allied World. Decl. ¶ 22; Ex. 3 at 38:38-6, 38:22-39:2.**

**23. Between 2017 and 2020, Allied World paid Asset Search Firm 1 at least $339,950.39. Decl. ¶ 23 (citing Ex. 12); Ex. 3 at 38:7-10. If Keating had used Allied World's former asset search firm, Allied World would have paid thousands of dollars less for the same services. Ex. 3 at 37:16-38:6, 40:7-11.**

**24. Asset Search Firm 1 was not formally created until December 30, 2016—a month after Keating sent his email asking for a fee quote. Decl. ¶ 24. It is in fact a joint venture owned 50/50 by Keating and Attorney 1. *Id.* (citing Ex. 13);**

**Ex. 3 at 35:9-19. Keating received Schedule K-1s for Asset Search Firm 1's income and partner distributions showing that Keating owned 50% of the company, which he held indirectly through SR5. Decl. ¶ 24 (citing Ex. 13); Ex. 3 at 35:22-36:23. Between 2017 and 2020, Asset Search Firm 1 distributed at least $124,549.22 to Keating (through SR5)—much of which he reported as income in his personal tax returns. Decl. ¶ 24; Ex. 9 at TD0001483, TD000194, TD0002000, TD0002012, TD0002964, TD0002092, TD0002120, and TD0002162; Ex. 14 at JEF0000309, JEF0000350; Ex. 15 at JEF0000049, JEF0000133; Ex. 16 at JEF0000599; *see also* Ex. 10 (reflecting Keating's use of SR5 funds for home renovations and other personal expenditures).**

**25. Keating never disclosed to Allied World his relationship with Attorney 1, their illicit kickback arrangement, his beneficial ownership interest in Asset Search Firm 1 (through SR5), or the fact that they had agreed to overcharge Allied World for Asset Search Firm 1's services. Decl. ¶ 25; Ex. 3 at 34:22-35:8, 39:11-42:18. If Allied World had known this information, it would not have permitted Keating to retain Asset Search Firm 1 or paid the invoices that Keating authorized. Decl. ¶ 25; Ex. 3 at 39:11-42:18.**

**E. The American Construction Scheme**

**26. On August 2, 2017, Keating created a Letter of Intent purporting to be from Allied World to a "Robert Peterson" at American Construction, which used a Delaware P.O. Box as its address. Decl. ¶¶ 27-28, 31; Ex. 17 at AW0050980; Exs. 1-2 ¶ 21; Ex. 3 at 44:5-46:14. This letter stated Allied World's intent "to enter into a Time and Material contract for the balance of plumbing work needed" for certain**

**projects that were the subject of a legitimate claim on a surety bond issued by Allied World. Ex. 17 at AW0050980; Exs. 1-2 ¶¶ 21; Ex. 3 at 44:15-46:14.**

**27. Four months later, on December 28, 2017, Keating caused American Construction to enter into a Construction Services Agreement with Allied World, specifying that American Construction would perform certain plumbing work for $12,500. Decl. ¶¶ 28-29, 31; Ex. 17 at AW0050981-88; Exs. 1-2 ¶ 22; Ex. 3 at 46:15-50:6. Keating signed the agreement on behalf of Allied World, and a "Robert Peterson" purportedly signed on behalf of American Construction. Decl. ¶¶ 27-29; Ex. 17 at AW0050987-88; Exs. 1-2 ¶ 22; Ex. 3 at 46:15-48:16.**

**28. Keating then uploaded these documents, including an invoice from American Construction for $12,500, into Allied World's claims-handling system with a request for payment. Decl. ¶¶ 28-29; Ex. 17 at AW0050989-90; Exs. 1-2 ¶ 23; Ex. 3 at 48:17-51:9. Based on the documents Keating had submitted with this payment request, Allied World sent American Construction a check for $12,500 on January 2, 2018. Decl. ¶ 29 (citing Ex. 18); Exs. 1-2 ¶ 23; Ex. 3 at 51:19-52:17.**

**29. Public records show that American Construction was not established until January 16, 2018—two weeks after Allied World sent a $12,500 check to the company. Decl. ¶ 31; Ex. 20 at AW0050896; Exs. 1-2 ¶ 24; Ex. 3 at 42:19-25. The Certificate of Organization for American Construction lists the same address for the company as Keating's home in Paoli, Pennsylvania. Ex. 21 at AW0050896; Exs. 1-2 ¶ 24. The Certificate of Organization lists the organizer of American Construction as SR5, LLC, a company established by Keating himself in November 2013. Ex. 20 at AW0050896; Exs. 1-2 ¶ 24; Ex. 3 at 42:19-25.**

**30. In March 2018, American Construction filed a change of registered office, moving it from Keating's home address to Corporation Service Company. Keating himself signed this form as a "Member" of American Construction. Ex. 20 at AW0050898; Exs. 1-2 ¶ 25. None of American Construction's publicly available corporate documents lists the Delaware P.O. Box where Keating directed payments, and none of these documents lists anyone by the name of "Robert Peterson." Ex. 20; *see also* Ex. 3 at 45:3-51:12. That is because this "Robert Patterson" does not exist, and because Keating changed the address of American Construction to conceal his connection with the company. *See* Decl. ¶ 32; Exs. 1-2 ¶ 26; Ex. 3 at 45:3-51:12.**

**31. Keating does not contest that he continued this scam for over three years, including after he was transferred to USFIC. Exs. 1-2 ¶ 27; Ex.3 at 52:18-57:3. Nor does Keating contest that he repeatedly created falsified agreements and invoices, directed that paperwork to Allied World's operations team in Connecticut, and arranged for payment to American Construction in satisfaction of the claim. Exs. 1-2 ¶ 27; Ex.3 at 48:17-50:2, 52:18-57:3.**

**32. As a result of the requests he approved and submitted, Allied World made 51 separate payments authorized by Keating to American Construction on dozens of surety bonds—totaling at least $984,250.00—for work that American Construction never performed. Decl. ¶ 30 (citing Exs. 12, 19); Exs. 1-2 ¶ 27; Ex.3 at 52:18-57:3. Through its investigation, Allied World found no evidence that American Construction had performed any of the services for which it was paid. *Id.* ¶ 32.**

**F. Defendants Conceal Their Misconduct**

**33. Keating went to great lengths to conceal his misconduct from Allied World and its employees. See Decl. ¶ 32; Ex. 3 at 40:24-41:19, 44:5-45:24, 47:2-12, 55:12-24, 56:12-21. Among other things, Keating created multiple companies to prevent Allied World from detecting the kickbacks and funds he embezzled. *Id*. Keating also attempted to delete all records showing his approval of payments to American Construction from Allied World's claim files. Decl. ¶ 32; Ex. 3 at 58:17-59:19.**

**34. As a result, Allied World only discovered Keating's American Construction scheme in December 2020 and fired him on January 7, 2021. *See* Decl. ¶ 34; Exs. 1-2 ¶ 29.**

**Dated:** **April 1, 2022**
**Hartford, CT**

***/s/ James L. Brawley***

**James L. Brawley**
**Cristin E. Sheehan**
**MORRISON MAHONEY LLP**
**One Constitution Plaza, 10th Floor**
**Hartford, CT 06103**
**(860) 616-4441**
**jbrawley@morrisonmahoney.com**
**csheehan@morrisonmahoney.com**

**OF COUNSEL**
**Jane M. Byrne**
**Guyon H. Knight**
**MCDERMOTT WILL & EMERY LLP**
**One Vanderbilt Avenue**
**New York, NY 10017**
**(212) 547-5400**
**jbyrne@mwe.com**
**gknight@mwe.com**

***Attorneys for Plaintiffs Allied World Insurance Company, Allied World Specialty Insurance Company, Allied World National Assurance Company, and United States Fire Insurance Company***